UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:04CV-157-R

MARCUS & MILLICHAP REAL ESTATE
INVESTMENT BROKERAGE COMPANY                                        PLAINTIFF

v.

DAN SKEETERS, ET AL.,                                              DEFENDANTS

### MEMORANDUM OPINION

This matter is before the court upon cross-motions for summary judgment (Dkt. Nos. 59 & 60).  Responses and replies have been filed (Dkt. Nos. 69, 70, 71, 72, 77, & 81).  The Kentucky Attorney General has decided not to intervene (Dkt. # 82). The matter is now ripe for decision.  For the reasons that follow, Plaintiff's Motion for Summary Judgment is **GRANTED in part and DENIED in part**, and Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

### STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material

fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence.  To support this position, he must present evidence on which the trier of fact could find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).  Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tomkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## BACKGROUND

Plaintiff Marcus & Millichap ("M & M") brought this action against Dan Skeeters, Real Estate Investment Advisors ("Skeeters") and Bridgeland Investments, LLC ("Bridgeland") asserting  trademark, contract and tort theories of recovery.  M & M amended its complaint to add a breach of fiduciary duty claim and a punitive damages claim. M & M filed a second amended complaint adding a claim of defamation.  A permanent injunction was entered on trademark claims (Counts I-III of the complaint) on October 6, 2004.  The Plaintiff additionally alleged tortious interference by the Defendants.  The Defendants filed a counterclaim for

declaratory judgment for lost funds. The Defendants amended their counterclaim to add claims for reasonable attorneys' fees and unjust enrichment.

M & M is one of the largest commercial real estate brokers in the United States (Dkt. # 1). Mr. Skeeters is a licensed real estate broker in Kentucky. M & M entered into an independent contractor relationship with Skeeters (Dkt. # 59). The parties signed two documents governing their relationship; a Retention Agreement ("Agreement") and a Salesperson Agreement. Id. Skeeters thought that M & M would refer real estate listings to him from M & M's out-of-state brokers, and he would do the work on them. Id. The Retention Agreement stated that Skeeters would handle all "necessary brokerage activities in the state of Kentucky" in exchange for receiving $2500 for each closing (Dkt. # 60). The Salesperson Agreement set forth general terms of Skeeters's relationship with M & M. Id..

Skeeters alleges that out-of-state agents performed unlicensed brokerage activities (Dkt. # 59). Skeeters claims that the KREC investigated M & M on four separate occasions. Id. The first investigation was of M & M brokers James Carmichael, Jonathan Lee, and John Sebree. Id. The KREC voted to refer these cases to the various county attorneys for prosecution. Id. M & M settled these cases by agreeing to pay a fine of $8,000 for eight incidents of illegal brokerage. Id. The second investigation was of Mark Lasman regarding the property that had been a Dillard's in the Bashford Manor Mall in Louisville. Id. This investigation ended with the KREC finding there was insufficient evidence. Id. The third investigation involved allegedly illegal brokerage of Max & Erma's in Lexington, Kentucky. Id. The investigation was tabled and no further action was taken. Id. The fourth investigation was concerning Chris Rea's involvement with a PetSmart store in Florence, Kentucky. Id.

In August 2003, the KREC informed Kentucky licensed brokers that they would be held responsible, both in civil and criminal actions, for real estate brokerage activities of out-of-state affiliates. Id. On October 2003, Skeeters informed the KREC about the PetSmart listing, which only had Mr. Rea as the contact even though Mr. Rea is a broker in M & M's Atlanta office. Id. In November 2003, M & M terminated their relationship with Skeeters.

In February 2004, Skeeters reported the alleged illegal brokerage activities of M & M concerning the properties of  Rite Aid–Whitesburg, Kentucky, Rite Aid–Somerset, Kentucky, and Burger King, LaGrange, Kentucky. Id.  The KREC determined that M & M agents had participated in real estate brokerage without a license in violation of Kentucky law as they had interpreted it and passed a motion to refer these matters to the appropriate County Attorneys. Id. Skeeters was the broker of record in the last three transactions. Id.  He received $194, 800 for the three closings. Id. M & M claims that it allowed Mr. Skeeters to continue to close these deals after they terminated him (Dkt. # 60), and are now entitled to the balance of the commissions minus $7500 that belongs to Skeeters through the terms of the Retention Agreement.

 Skeeters asked the KREC whether he could pay to M & M the commissions that he received from the sale of Rite Aid in Whitesburg, Kentucky, Rite Aid in Somerset, Kentucky, and Burger King in LaGrange, Kentucky in light of M & M's unlicensed brokerage activity (Dkt. # 59). The KREC told Mr. Skeeters not to give the commissions to M & M. The KREC refused to tell Skeeters what he should do with those commissions otherwise (Dkt. # 60).  In this action, M & M seeks to recover these commissions on a breach of contract theory arising out of the Retention Agreement and the Salesperson Agreement. Id.  Skeeters argues that the interpretation of KRS 324.020(4) by the KREC prohibits him from paying the commissions to M & M, and

makes the Agreement unenforceable as a matter of law.  M & M argues that the KREC's interpretation of the statute violates the Commerce Clause of the United State Constitution.

M & M claims that Skeeters acted improperly with regard to the listing of Keystone Farms owned by Cypress Point, LLC and Oak Tree Villas owned by Oak Tree Villas, LLC. Id. M & M alleges two causes of action arising out of these transactions: tortious interference with contractual relations and breach of fiduciary duty. Id.  On November 5, 2003, Skeeters and the agent for the properties, Mr. Nolan, signed an agreement to sell the properties. Id.  M & M claims that it was their exclusive listing because it was on their form and that they had initially contacted with Mr. Nolan out-of-state in regards to selling the property. Id. One of M & M's agents, Kevin Morris, a Florida broker, corresponded with Mr. Nolan at the end of August 2003  to obtain preliminary data to analyze and list the properties (Id.).  Mr. Morris gave the information to Mr. Skeeters. Id.  Skeeters claims that Mr. Nolan signed the contract with his company Bridgeland doing business as Marcus & Millichap of Kentucky (Dkt. # 59), while M & M alleges that Skeeters undermined M & M's contractual relationship with Mr. Nolan by talking him out of their dealings with him on the two above mentioned property listings.

M & M also alleges that Skeeters breached his fiduciary duties to M & M by not returning M & M's transaction files and giving confidential information to the KREC (Dkt. # 60).  Plaintiff also alleges conversion claims against the Defendants, arguing the Defendants converted their computer equipment, transaction files and fees.  To counter, Skeeters alleges that M & M improperly interfered with his prospective business advantage.

Lastly, M & M claims that Mr. Skeeters defamed them by sending the following letter en mass after M & M terminated their relationship on November 7, 2003:

As you may have guessed, I am no longer associated with Marcus & Millichap. It is unfortunate that our relationship did not work out, but in the long run, I believe it is for the best. As the "broker of record" for Marcus & Millichap of Kentucky, I felt that the firm was putting my reputation, brokerage license and livelihood in jeopardy. The Kentucky Real Estate Commission has investigated Marcus & Millichap on four separate occasions over the past 18 months for unlicensed brokerage activity on the part of its agents outside of the state. These were circumstances that I simply could not tolerate. The firm's unwillingness to change its practices and my unwillingness to compromise my ethics ultimately led to the decision to terminate our relationship.

Skeeters denies such a claim arguing truth as a defense and claiming that his letter constituted privileged speech because it was his opinion.

In their counterclaim, the Defendants ask for declaratory judgment, arguing that M & M owes funds to Skeeters due to unjust enrichment. Further, Skeeters asserts a claim in equity against M & M based upon the controversy over the previously mentioned funds. Lastly, Skeeters requests reasonable attorneys' fees as the prevailing party, should the Court grant their motion for summary judgment. M & M denies the validity of such counterclaims in their motions, respectively, and also seeks reasonable costs and attorneys' fees.

## DISCUSSION

## I.    PLAINTIFF'S CLAIMS

### 1.  Contract Claim

#### A.  *Is the Retention Agreement Enforceable?*

The Defendants claim that KRS 324.020 and Kentucky law prohibit the enforcement of the Retention Agreement signed between the parties on June 10, 2002. As argued by the Defendants, the interpretation of KRS 324.020 by the Kentucky Real Estate Commission ("KREC") would preclude the commission payment to M & M. However, M & M asserts that

the interpretation by the KREC as advocated by Skeeters violates the Commerce Clause of the United States Constitution.  Additionally, both parties have cited state law authorities supporting their interpretations.  The Court will address each of these issues separately.

**i.   Does the interpretation of KRS 324.020 by the KREC as offered by Skeeters violate the Commerce Clause?**

Article I, Section 8, Clause 3 of the United States Constitution states that Congress shall have the sole authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  This past May, the United States Supreme Court decided the matter of *Granholm v. Heald*, using an in-depth commerce clause analysis to determine the outcome of the case. *Granholm v. Heald*, 125 S. Ct. 1885 (2005).  In beginning their discussion, the Court, in an opinion by Justice Kennedy, articulated that "[t]ime and again this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Granholm* at 1895, *See*, *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994).  Justice Kennedy continues noting that "[t]he rule prohibiting state discrimination against interstate commerce follows also from the principle that States should not be compelled to negotiate with each other regarding favored or disfavored status for their own citizens," reasoning that such rules remain in place to ensure that citizens have a right to access out-of-state markets on equal terms. *Id.* at 1895-96.  In particular, Justice Kennedy explains that "[s]tate laws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *Granholm* at 1899, *citing*, *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  In addition, "facially neutral" state laws

7

may also burden and affect interstate commerce, and will be struck down under the commerce clause if they place an "impermissible burden on interstate commerce." *Granholm* at 1898. Such burdens include "economic protectionism--that is, 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996), *See*, *Associated Industries of Mo. v. Lohman*, 511 U.S. 641, 647,(1994) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-274, (1988).

In the instant matter, the Court agrees with the Defendants that KRS 324.020(4), at the time of the transactions in question, was a facially neutral statute.  Taken in its pertinent and applicable part to this case, the statute at the time read:

> No broker shall split fees with or compensate any person who is not licensed...except that a broker may *compensate or split fees* with a broker licensed outside of Kentucky.

(emphasis added).  Further, the Court agrees with the Defendants that KRS 324.020(4) is a constitutional statute that does not violate the commerce clause of the United States Constitution. However, the language used by the Kentucky Real Estate Commission to interpret the plain language of the statute as offered by Skeeters to make the contract unenforceable in order to deny any commissions to M & M from the real estate transactions in question violates the commerce clause.  This Court cannot hold that the Kentucky Legislature intended such an unconstitutional interpretation and application of its statute when the bill passed through its legislative floors in route to becoming a law of this Commonwealth.  Norman Brown of the KREC stated in his affidavit that:

> Kentucky law, pursuant to KRS 324.020(1) and (2), requires that all real estate brokerage with regard to a property in Kentucky be performed by a broker licensed in Kentucky.  Other unlicensed out-of-state brokers in the same firm or

company as a Kentucky broker cannot handle *any* real estate brokerage related to Kentucky property.  Similarly, it is not sufficient to have the Kentucky broker "approve" or "sign off" on real estate brokerage performed by out-of-state brokers not licensed in Kentucky.  *Any and all* matters concerning Kentucky listings or potential purchasers or lessees in Kentucky must be handled by a Kentucky real estate broker. (empahsis added).

As taken by the KREC, but more importantly as offered by Skeeters, this interpretation of the plain language of the statute would unconstitutionally protect Kentucky real estate brokers at the expense of out-of-state brokers and the citizens of Kentucky by restricting market access and opportunities to conduct real estate in the Commonwealth by not allowing in-state brokers and out-of-state brokers to contract to make compensation arrangements.  In his affidavit, Brown further stated:

It has been the long-standing interpretation of the KREC that KRS 324.020(4) merely allows an out-of-state broker licensed in another state to refer a client with an interest in the purchase or sale of Kentucky real estate to a Kentucky-licensed real estate brokers and receive a referral fee.  The Kentucky broker must handle all aspects of the transaction from that point on.

This interpretation by Brown may reflect the current interpretation of the amended statute, but the statute at the time explicitly stated that out-of-state licensed real estate brokers could also receive compensation, which differs from only receiving referral fees as advocated by the KREC. Included within the meaning of compensation are commissions that come from the sales of these transactions.

Though the KREC does not directly state that an in-state Kentucky real estate broker and out-of-state licensed real estate broker cannot contract to arrange compensation fees, their interpretation as offered by Skeeters would prohibit the actions contracted for within the contract from taking place.  In other words, the in-state and out-of-state brokers could legally contract

9

concerning compensation arrangements, however, they could not perform on their legally enforceable contract.  This interpretation given by the KREC as offered by Skeeters indirectly holds that any such contracts entered into would be unenforceable under the statute.  To apply that standard to the instant matter or any other similar contract made under the statute at the time would violate the commerce clause of the United States Constitution by acting as a protectionist economic restraint on commerce by favoring in-state over out-of-state agents.

Further, the purposes offered by Skeeters in support of the interpretation do not stand weighed against the burden that the interpretation would have on interstate commerce.  Kentucky does have a right to protect its citizens from unlicensed and unscrupulous brokerage activity, however, a less restrictive interpretation that would not burden interstate commerce and allow for the security of Kentucky residents exists through a plain-language interpretation of the statute, rather than applying the standard advocated by the KREC as offered by Skeeters.  As offered by the Plaintiff, the North Carolina case of *Furr v. Fonville Morisey Reality, Inc*., a case from the North Carolina Court of Appeals, provides a constitutional interpretation of a very similar statute that not only grants opportunities and economic benefits to all parties, but also protects Kentucky citizens.  As stated:

> [W]hen, as happens with increasing frequency in our state, the buyer/lessee is an out-of-state investor or corporation with complex interests and concerns best known to its regular brokers in its home state, the interests of the parties are better served if the out-of-state party is allowed to rely on the combined efforts of a local broker and a broker familiar with its particular situation. The North Carolina broker can then make certain that the guidelines, regulations and laws of this State are observed while the out-of-state broker can advise the foreign investor on matters critical to its overall interests. In such an arrangement, the North Carolina licensed broker will be legally and professionally responsible for the acts of the cooperating out-of-state broker as well as for its own acts in the venture. Such an arrangement seems to us to be clearly in line with the legislative intent embodied in Chapter 93A

10

of the General Statutes; indeed, the complete exclusion of its regular broker from a transaction may well render the foreign buyer/lessee more vulnerable to fraud.

*Furr v. Fonville Morisey Reality, Inc.*, 503 S.E.2d 401, 406 (N.C. App. 1998).  In addition, our sister state in the Sixth Circuit, Tennessee, has also recognized a similar approach to North Carolina, holding "[i]n this modern-day world, this Court can take judicial notice of the fact that Tennessee real estate is bought and sold on a daily basis by persons and entities not only from foreign states, but from foreign countries. Interstate real estate transactions should be encouraged, not discouraged." *Bennett v. MV Investors*, 799 S.W.2d 221, 225 (Tenn.App.1990).  This Court feels that this interpretation better meets the intentions of the Kentucky Legislature concerning the pre-amended statute in question, and it shall apply that interpretation in this matter.  This holding is limited as to the interpretation as offered by Skeeters to the instant matter.

Therefore, this Court finds that the interpretation of pre-amended KRS 324.020 by the KREC as offered by Skeeters violates the commerce clause of the United States Constitution.[1]

## ii.   Does the interpretation of Kentucky Law preclude the payment of commission?

The Defendants assert that in Kentucky "it is illegal for a person who is not a Kentucky licensed broker to perform any real estate brokerage activities." Docket #69 at 6.  Skeeters cites KRS  324.020(2) and the case of *Kirkpatrick v. Lawrence* to further argue that "[a]ny contract for a commission to be paid to a person not licensed in Kentucky for unlicensed brokerage work is unenforceable in Kentucky." Id. *citing*, *Kirkpatrick v. Lawrence*, 908 S.W.2d 125, 127-29 (Ky.

---

[1]KRS 324.020 was amended in 2004, after the transactions in question took place.  This opinion does not apply to the interpretation of the current statute, but only to the interpretation of the statute by the KREC as offered by Skeeters at the time of the Retention Agreement between the parties and when the transactions in question took place.

App. 1995).  The Plaintiff distinguishes this case and holding by arguing that *Kirkpatrick* involved the case of an out-of-state professional who dealt with an in-state public citizen, and claims that on the contrary, Kentucky upholds and enforces private contracts between professionals regardless of the licensing requirements. Docket #60 at 15-18; Docket #70 at 12; *Edmonds v. Fehler & Feinauer Constr. Co*, 252 F.2d 639, 643 (6th Cir. 1958); *Kennoy v. Graves*, 300 S.W.2d 568, 570 (Ky. 1957).

Neither party in this instance took into consideration the weight of the constitutional argument analyzed *supra*, in determining whether or not Kentucky law precludes payment of a commission to an out-of-state and unlicensed real estate broker.  This Court holds that the above mentioned constitutional analysis taken with the arguments put forth by the Plaintiff clearly demonstrate that Kentucky law *at the time* favored the payment of commissions to out-of-state real estate brokers under the terms of a private professional contract *only* when such transactions involve professionals within the same professional realm, and not members of the general public.  The Court in *Edmonds* found that:

> [T]he technical requirements of the licensing statute play no part in determination of  just claims between persons in the same business field who have contracted with knowledge of each other's respective professional qualifications.

*Edmonds*, 252 F.2d at 643, *citing*, *Kennoy*, 300 S.W.2d at 570.  In the instant matter, the Retention Agreement signed by the parties on June 10, 2002 clearly and unequivocally set out the terms of payment between M & M and Skeeters.  Further, both parties in this matter are professional real estate brokers for purposes of the law and the contract.  Though the laws of Kentucky would protect public persons who engage in such contracts with licensed professionals, to do so here, where two informed and licensed professionals have made a private agreement at

their own will, would undermine the basic freedom of professionals to contract with one another that has been recognized by the Courts of this state.  *Id.*  To hold that Kentucky law prohibits the payment of such commissions contracted for between private professional parties not only goes counter to set Kentucky law offered by the Plaintiff and recognized by this Court, but also arguably violates the commerce clause for the reasons mentioned *supra*, by unduly burdening interstate commerce.   Our interpretation is limited to out-of-state licensed brokers having the right to enter into a contract with in-state licensed brokers concerning compensation and fee arrangements.[2]  The intent of the legislation at that time was to protect the public from unlicensed brokers or brokers unfamiliar with Kentucky real estate practice and law.  The purpose was not to prevent licensed brokers from different states from entering into a contract to split fees and compensation.  Therefore, this Court holds that the contract in question did not violate Kentucky law and was not void.

Therefore, for the foregoing reasons, this Court holds that as a matter of law, the Retention Agreement signed by the parties is an enforceable contract.

### B.  Did Skeeters breach the contract?

The facts concerning whether or not Skeeters breached the terms of the Retention Agreement are not in dispute.  The Defendants relied upon and offered to no avail the KREC interpretation of KRS 324.020 and the holding of the *Kirkpatrick* case in supporting their argument that the Agreement was unenforceable as a matter of law.  However, the unambiguous terms of the Retention Agreement state that Skeeters would receive "adequate consideration for

---

[2]The statute in question was amended after the transactions in the instant matter took place.  This opinion applies only to the interpretation of the statute at the time the Retention Agreement was made between the parties, and not to the subsequent amended statute.

each closing, in the amount of $2,500.00 which you will receive from Marcus & Millichap."

Agreement at 1.  Further, in the same paragraph, the language clearly explains:

> Your compensation for all such services for the term of this Agreement shall be limited to the amount noted above, and you (Skeeters) hereby waive any claim to any and all commissions paid upon the sale of the Property.

Id.  In the instant matter, Skeeters has withheld $187,300.00 of commissions from M & M.  The terms of the Agreement state that those funds belong to M & M.  As such, Skeeters has breached the Agreement.

Therefore, this Court holds that the Defendants breached the terms of the Retention Agreement, and this Court orders that the Defendants pay the sum of $187,300.00 to the Plaintiff.

## 2. Attorneys' Fees

Both parties to this suit have claimed reasonable attorney fees for rightfully enforcing the obligations of the Retention Agreement.  On this matter both parties have misinterpreted the Agreement.  As plainly stated by the terms of the Agreement, the parties shall be entitled to reasonable costs and attorneys' fees *if* they submit their claims before the American Arbitration Association in Elizabethtown, Kentucky. Agreement at 2.  Here, neither party has submitted their claims for arbitration, and neither party has petitioned the Court to compel arbitration.  As such, the terms of the arbitration clause do not apply, and neither party shall receive reasonable costs and attorneys' fees.

Therefore, this Court finds that neither the Plaintiff nor the Defendants shall receive reasonable costs and attorneys' fees from the outcome of this decision.

## 3. Fiduciary Duty

Both parties to this matter agree that pursuant to the Salesperson Agreement Skeeters was

an independent contractor. Docket #60 at 34; Docket #72 at 10.  However, the Plaintiff argues that under the terms of the Retention Agreement, a relationship formed between M & M and Skeeters amounting to that of a principal and agent.  This Court does not agree.  The Plaintiff cannot ignore the fact that the Salesperson Agreement governed the relationship between the parties as that of an arms-length business relationship, and not that of a principal and agent.  Still, the Defendants offer a three part test determine whether or not a fiduciary relationship existed, arguing that M & M must show: 1) a relationship existed before the transaction that is the subject of the complaint took place; 2) the party seeking to have a fiduciary relationship recognized must show more then mere subjective trust; and 3) the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary. Docket #69 at 28; *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002).

Here, though the Plaintiff can show that a relationship existed before the transaction in question took place, that relationship was an arms-length relationship as evident from the language of the Salesperson Agreement and the lack of an express provision in the Retention Agreement indicating the existence of a fiduciary relationship.  Further, the language of the Salesperson Agreement denoting an independent contractual relationship rather than a fiduciary relationship would show that the nature of the arrangement between the Plaintiff and the Defendants was for the interest of both parties, and that Skeeters would not act to his detriment on behalf of M & M.  As both parties sought to benefit from the relationship and each relied on one another, M & M on Skeeters' in-state license and Skeeters on M & M's referrals, the parties' conduct did not amount to a fiduciary relationship.

Therefore, this Court finds that no fiduciary relationship existed between the Plaintiff and the Defendants.

### 4.  Intentional Interference Claim

In Kentucky, a cause of action for intentional interference with contractual relations requires the Plaintiff to show the following six elements: (1) the existence of a contract; (2) Defendants' knowledge of this contract; (3) that the Defendants intended to cause its breach; (4) the Defendants' conduct caused the breach or prevented the contract from coming into being; (5) this breach resulted in damages to M & M; and (6) the Defendants had no privilege or justification to excuse its conduct. *Restatement (Second) of Torts §766*; *See*, *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1079 (W.D.Ky. 1995) (*citing*, *Carmichael-Lynch-Nolan Advertising Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99 (Ky. App. 1977).

In the instant matter, both parties allege interference claiming ownership of the apartment listings for Keystone Farms and Oak Tree Villas.  The Plaintiff has asked this Court to decide whether or not M & M owns the original listings to Keystone Farms and Oak Tree Villas in order to evaluate Skeeters' interference with these properties. Docket #70 at 3.  On the one hand, M & M asserts that Skeeters' and Kevin Morris, an agent for M & M, were acting pursuant to the Retention Agreement, and that Skeeters had been authorized by M & M to sign the agreement as their principal broker in Kentucky. Id. at 14-15.  On the other hand, Skeeters alleges that he received a tip from Kevin Morris initially, that no contract between M & M and the said listings through Skeeters came into being before or after his termination with M & M, that Skeeters entered into a representation agreement with Mr. Nolan through his company Bridgeland d/b/a Marcus and Millichap of Kentucky, and the listings were eventually referred to his new company

16

following the termination of his relationship with M & M. Docket #59 at 13-14.  Each has

offered supporting facts through affidavits and discovery to bolster their arguments.  However, in

determining whether or not a contract existed between the Plaintiff and Mr. Nolan in regards to

the listed properties, the Court must also look at the facts that are not in dispute at the time prior

to Skeeters' termination.

   At the time Skeeters received correspondence from Kevin Morris regarding the Keystone

Farms and Oak Tree Villas listings, he was bound by the terms of the Agreement with M & M.

Kevin Morris was an affiliated agent of M & M when he referred the listings to Skeeters.

Skeeters was M & M's principal broker in Kentucky at that time.  The forms used were M & M

forms that displayed their logos on the tops and footers.  Skeeters admits that both listings

originated with M & M through Mr. Morris.  In addition, Mr. Morris submitted through his

affidavit that Skeeters executed these agreements on behalf of M & M through the Agreement

they signed with Skeeters, and that Mr. Morris, acting as an affiliated agent of M & M, obtained

the necessary preliminary data to analyze and list the properties for sale.  In addition, Bridgeland,

the company that Skeeters claims signed the initial contract, was Skeeters' company that he

owned and operated.

   Although the Defendants do not challenge the latter prongs of the six-part test, and

despite the facts that tend to favor the argument of the Plaintiff, the Court does not feel confident

at this time to grant M & M summary judgment on this matter.  The contested facts constitute

genuine issues of dispute that should go before a finder of fact.

   Therefore, this Court finds that intentional interference claim should go forward to be

determined by the finder of fact.

### 5. Defamation

In Kentucky, in order to state a claim for defamation, the Plaintiff must show that: 1) a defamatory statement was made; 2) of or concerning the Plaintiff; 3) which was published to a third party; and 4) which caused injury to the Plaintiff's reputation. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981). A defamatory statement is measured by looking at the publication as a whole to gage the effect on the average reader. *Ashby v. Hustler, Magazine, Inc.*, 802 F.2d 856, 858 (6th Cir. 1986). Harm to one's reputation is presumed if the publication is defamatory per se, meaning "the words in their essence must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society." *Courier Journal v. Noble*, 65 S.W.2d 703 (Ky. 1933); *Columbia Sussex Corp., Inc.*, 627 S.W.2d at 274; *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995). However, "written or printed publications, which are false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame, are libelous per se." *Courier Journal* at 703. In the absence of defamation per se and libel per se, the party must prove injury through extrinsic facts or explicatory circumstances. David A. Elder, Kentucky Tort Law: Defamation and the Right of Privacy, § 1.06 at 37 (1983).

Truth is an affirmative defense and complete defense to a defamation claim. *Buchholtz v. Dugan*, 977 S.W.2d 24, 27 (Ky. App. 1998). In addition. "[a]n expression of opinion, as opposed to a defamatory statement of fact, is entitled to an absolute privilege." *Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732, 737 (Ky.App.,2004). However, "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement

18

of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (1989).

Here, the following letter sent by Skeeters is the basis of the defamation claim:

As you may have guessed, I am no longer associated with Marcus & Millichap. It is unfortunate that our relationship did not work out, but in the long run, I believe it is for the best. As the "broker of record" for Marcus & Millichap of Kentucky, I felt that the firm was putting my reputation, brokerage license and livelihood in jeopardy. The Kentucky Real Estate Commission has investigated Marcus & Millichap on four separate occasions over the past 18 months for unlicensed brokerage activity on the part of its agents outside of the state. These were circumstances that I simply could not tolerate. The firm's unwillingness to change its practices and my unwillingness to compromise my ethics ultimately led to the decision to terminate our relationship.

The Plaintiff asserts that two statements from the letter constituted defamatory remarks: "These were circumstances that I simply could not tolerate;" and "The firm's unwillingness to change its practices and my unwillingness to compromise my ethics led to the decision to terminate our relationship." Docket #70 at 17.

In looking at the first statement, the Court finds it to be an expression of opinion protected by absolute privilege. Though an opinion statement may rise to the level of a defamatory remark, this statement, taken in the entirety of the letter, does not meet this standard because the circumstances to which Skeeters refer to were a matter of his pure opinion, and therefore fall under the category of an absolute privilege. Expressing this first remark in the first person as to what he felt at the time suggests that the statement made was an opinion rather than a defamatory statement. The Plaintiff suggests that this statement of opinion is actionable because it implies the wrongful reason as to why Skeeters left M & M, with M & M asserting that Skeeters was terminated, and he did not leave on his own under the described

19

"circumstances."  However, though Skeeters may have been terminated, the statement implies that he could not "tolerate" his situation at the time of the termination, not that he left of his own volition.

However, the prior statement, taken in the context with the second statement and the entirety of the letter may rise to the level of a defamatory statement or constitute libel per se.  The second statement implies that Skeeters left M & M on his own accord because of their unethical practices, and in particular their "unwillingness" to change their practices.  The Plaintiff argues that Skeeters never made a decision to end his relationship with M & M because he was terminated by them, and therefore had no part in the decision.  The Defendants argue that the truth acts as a defense in this instance because the Plaintiff had been under the investigation of the KREC and had been told to change its practices by the KREC.  Though this argument may have some veracity to it, it is misplaced under this claim because the Plaintiff has not asserted that they were not unwilling to change their practices, but that Skeeters had no part in his termination and that M & M made this decision, not Skeeters.  The facts indicate that Skeeters had been terminated by M & M, and that Skeeters had no part in this termination process.  A reasonable person could interpret this statement to imply that Skeeters left M & M because he could not tolerate the unethical circumstances surrounding M & M and that M & M would not change their unethical practices, not that Skeeters had been terminated by M & M.  Therefore, the second statement, taken in the context of the entire letter and extrinsic evidence, may rise to the level of a defamatory statement, and as such constitutes a genuine issue of material fact to be decided by the finder of fact.

The second part of the four-part test has been met because the second statement does

20

concern the Plaintiff.  The third part of the test has also been shown as both Skeeters and M & M

admit that Skeeters sent this letter en mass to property owners and real estate professionals,

satisfying the requirement that the defamatory statement be published to a third party. Docket #

70 at 16.  To satisfy the fourth and final prong of the test, the harm to the Plaintiff's reputation

may be shown through the use of extrinsic evidence, including that Skeeters had been terminated

by M & M, and that Skeeters had no part in that decision.  In addition, to satisfy the fourth prong,

the Plaintiff may also argue libel per se as enough facts may exist that the Plaintiff may argue that

the written words are "false and tend to injure one in his reputation or to expose him to public

hatred, contempt, scorn, obloquy, or shame" *Courier Journal* at 703.

Therefore, this Court finds that the Plaintiff's defamation claim against the Defendants

should go forward to be decided by a finder of fact.

### 6. Conversion

Plaintiff claims that the Defendants have wrongfully converted the following from M &

M: 1) computer equipment, 2) transaction files and 3) fees.  201 KAR 11:062 states that:

> All brokers shall preserve for five (5) years following its consummation, records
> in one (1) file relating to any real estate transaction, which shall include the
> acquisition of and disbursement of any monies, listing and sales contracts, closing
> sheets, property disclosure forms and agency disclosure forms.

In Defendants' Reply in Support of their Motion for Summary Judgment, they note that

M & M has either been provided with copies of the transaction files, or have copies already

through their agents who handled matters in Kentucky.  Regardless, Skeeters has a legal right to

maintain the files under 201 KAR 11:062, and if the Plaintiff has already received such files,

their argument that the Defendants converted the files is moot.  In addition, Skeeters notes that he

21

purchased the computer router in question, and M & M has not offered any evidence to the contrary.  Lastly, the matter of commission fees has already been addressed by this Court *supra*, and it does not need to be addressed again for purposes of a conversion claim.

Therefore, this Court finds that the conversion claim shall not go forward and shall be dismissed, but orders, if not done already, that the Defendants provide copies to the Plaintiff of the transaction files in question.

### 7.  Punitive Damages

M & M argues that it is entitled to punitive damages.  KRS 411.184 states that in order for a plaintiff to receive punitive damages, the plaintiff must show by clear and convincing evidence that  the defendant acted with "oppression, fraud or malice."  In the instant matter, making this claim would force the Court to decide a genuine issue of material fact as to whether or not Skeeters' actions had the requisite intent required to meet this standard.  However, enough facts exist so that a reasonable jury could make an informed decision one way or the other in as far as whether or not Skeeters' conduct was so "outrageous" in character that it warrants awarding punitive damages.  If this case is tried this issue can be better addressed at the close of all the evidence.  It is possible that the Court could grant the motion at that time.  However, the Court is not confident that material issues of fact do not exist.

Therefore, at this time, the motion for summary judgment as to punitive damages is denied.

## II.  DEFENDANTS' CLAIMS

### 1.  Declaratory Judgment - Funds Owed to Skeeters

The Defendants seek declaratory relief on the payments made to M & M concerning eight

transactions that Skeeters argues were conducted by unlicensed M & M real estate brokerage agents in Kentucky. The Defendants seek to have M & M pay Skeeters more than the agreed upon commission received by Skeeters that had been set up in the Retention Agreement by the parties. This Court cannot find any reasoning why the Defendants would be entitled to additional commissions from the transactions other than those contracted for in the Retention Agreement. Even assuming that all the transactions in question were performed illegally by unlicensed real estate brokers, the Defendants cannot cite and have not cited any law that would entitle Skeeters to receive more than his contractual share. As mentioned *supra*, the Retention Agreement explicitly states that Skeeters would receive $2,500.00 per transaction, and that he would waive "any claim to any and all commissions paid upon the sale." Retention Agreement at 1. As analyzed *supra*, the private agreement between professionals should be enforced despite the interpretations of the KREC as offered by Skeeters, and this is supported by Kentucky law. As such, Skeeters is not entitled to more funds than what he contracted for in the Retention Agreement.

Therefore, this Court does not grant the declaratory relief sought by the Defendants, and dismisses their claims as to any additional funds owed to Skeeters under the transactions in question.

### 2. Unjust Enrichment

The Defendants claim that M & M has been unjustly enriched by M & M's failure to reimburse the Defendants for office expenses stemming from alleged agreements between Jonathan Lee, the Regional Manager of M & M in Skeeters' region, and Skeeters, claiming that M & M owes Skeeters $38,212.73 for expenses incurred. Specifically, Skeeters claims that he is

23

entitled to recover funds from M & M for: 1) goodwill and risk taken on by him; 2) funds expended by Skeeters to advertise and sell real estate in Kentucky; 3) office expenses;  and 4) funds possessed by M & M owned by the Defendants.  The Plaintiff disputes the facts as whether an agreement existed obligating M & M to reimburse Skeeters for his expenses and what exactly Skeeters would be entitled to should such an agreement exist.  To prove an unjust enrichment claim, the Defendants must show: 1) a benefit conferred upon M & M at the Defendants' expense; 2) a resulting appreciation of the benefit by M & M; and 3) an inequitable retention of the benefit without payment for its value. *Guarantee Electric v. Big Rivers Electric Corp.*, 669 F.Supp 1371, 1381 (W.D.Ky. 1987).

In the instant matter, a dispute between the parties exists as to whether or not M & M agreed to reimburse Skeeters for his office expenses.  Although Paragraph 10 of the Salesperson Agreement signed by the parties states that M & M "shall not be liable" for any expenses incurred by Skeeters, the parties may have subsequently altered the Salesperson Agreement by Mr. Lee promising Skeeters that M & M would reimburse him for his office expenses and other expenditures.  This possibility becomes evident by the fact that Skeeters did receive reimbursements for August 2002 through December 2002, as well as February 2003 through April 2003.  Skeeters claims that he had operating expenses that included: unpaid invoices; technology (including a website); trade organizations; contract services; general and administrative; market research; and market. Exhibit Q.

A genuine issue of material fact exists as to what exactly M & M agreed to reimburse the Defendants in regards to their expenses.  Though the Defendants have not conducted the proper analysis to meet the standard for unjust enrichment in their motions for summary judgment, they

have offered enough facts to meet the pleading burden to have this matter go forward to the finder of fact.  Further, the Plaintiff has not demonstrated that the unjust enrichment claim fails as a matter of law, but have simply restated the three prongs of the test arguing that the Defendants failed to meet them.  At this point, the Court does not feel confident enough to grant the Defendants' motion for summary judgment.

Therefore, this Court finds that the claim for unjust enrichment against M & M shall go forward to be decided by a finder of fact.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, and Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.  The Court orders that the Defendants pay the Plaintiff $187,300 of lost commissions under a claim of breach of contract; Plaintiff's claims of Intentional Interference and Defamation shall go before a finder of fact to determine the issues outstanding; the issue of Punitive Damages is denied at this time, but may be reexamined if the case goes to trial at the close of the evidence; and the Plaintiff's claims for Attorneys' Fees, Breach of Fiduciary Duty and Conversion fail as a matter of law.  The Court holds that the Defendants' claim of Unjust Enrichment shall go before a finder of fact to determine the issues outstanding; and the Defendants' claims for Declaratory Relief and Attorneys' Fees fail as a matter of law. Lastly, the Court holds that the Defendants should turn over copies of their transaction files in question to the Plaintiff, if they have not done so already.

An appropriate order shall issue.

25